## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **ERICA L. WEBSTER** | : |
| **11411 Lake Arbor Way, # 505** | : |
| **Bowie, Maryland 20721** | : |
| | : |
| **Plaintiff,** | : **Case No:** |
| | : |
| **v.** | : **JURY TRIAL DEMANDED** |
| | : |
| **Quality Investigations, Inc.** | : |
| **SERVE ON** | : |
| **Warren Strother, Resident Agent** | : |
| **511 11th Street, SE** | : |
| **Washington, D.C. 20003** | : |
| _____ | : |

## COMPLAINT AND JURY DEMAND

Plaintiff Erica L. Webster ("Plaintiff" or "Ms. Webster") brings this suit against her former employer, Quality Investigations, Inc. ("Defendant" or "QI"), under the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq.* for discrimination on the bases of disability, pregnancy, childbirth and related medical conditions.

## JURISDICTION AND VENUE

1. The United States District Court for the District of Columbia has jurisdiction of the instant litigation based upon 28 U.S.C. § 1331 because of federal question jurisdiction due to Ms. Webster's claims under the Rehabilitation Act.

2. The United States District Court for the District of Columbia has supplemental jurisdiction over Ms. Webster's DCHRA claims pursuant to 28 U.S.C. § 1367.

3. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because it is the judicial district within which Ms. Webster was employed when she was discriminated against by her former employer, QI. Therefore, a substantial part of the events or omissions giving rise to her claims occurred within the jurisdiction of the United States District Court for the District of Columbia.

## PARTIES

4. Ms. Webster is a natural person residing in Bowie, Maryland.

5. Quality Investigations, Inc. is a corporation foreign to the District of Columbia that is headquartered in Henderson, Nevada.

6. Quality Investigations, Inc. regularly conducts business within the District of Columbia providing security services as a federal contractor and recipient of federal funds.

## FACTS COMMON TO ALL CLAIMS

7. At the time of her termination, Ms. Webster worked as an armed Physical Security Officer at the Wilbur Wright Federal Building located in Washington, D.C.

8. Ms. Webster's duties, as an armed Physical Security Officer, encompassed protecting the employees and visitors at the Wilbur Wright Federal Building from threats and disturbances and monitoring the security of the building.

9. Ms. Webster had been working as an armed Physical Security Officer protecting federal buildings since she was hired by the contractor On Point Security to provide security services to the South East Federal Center in August of 2011.

10. Ms. Webster first went to the Wilbur Wright Federal Building as an armed Physical Security Officer in February of 2014.

11. At the time Ms. Webster began working as a Physical Security Officer at the Wilbur Wright Federal Building, Coastal International Security held the contract to provide security at the Wilbur Wright Federal Building. Accordingly, Ms. Webster was at that time a Coastal International Security employee.

12. In February of 2015 Defendant QI acquired the contract to provide security services to the Wilbur Wright Federal Building, and at that time Ms. Webster became an employee of QI.

13. Ms. Webster became pregnant in the summer of 2015 and she informed her employer, QI, that she was pregnant in or about October of 2015.

14. Prior to Ms. Webster informing QI that she was pregnant, she had never been disciplined or written-up in any way.

15. On February 25, 2016 Ms. Webster, who was at that time approximately two months from her due date of April 10, 2016, went into labor.

16.  Accordingly, Ms. Webster gave birth two months prematurely to a baby boy.

17. Because Ms. Webster's baby was two months premature, he initially had to be on oxygen and was given a feeding tube.

18. Ms. Webster's baby also could not maintain his body temperature, and therefore he had to be placed in an incubator for three weeks.

19. During this time period, Ms. Webster grew very depressed because she could not bring her son home.

20. Ms. Webster remained in the hospital until February 28, 2016, at which time she was discharged, while her son remained hospitalized.

21. After Ms. Webster was discharged, but her baby remained in the hospital, she would visit him three times a day in the hospital and had to regularly bring pumped breast milk to the hospital for her son.

22. At the time that Ms. Webster had her baby, she was told via email by Ellen S. Sherman ("Sherman"), Director of QI Human Resources that she would only be allowed to be out on maternity leave until March 25, 2016.

23. Ms. Webster was not eligible for Family Medical Leave Act ("FMLA") leave, because she had used FMLA leave the previous spring for foot surgery.

24. Ms. Webster was due to return from maternity leave on March 25, 2016, but she began experiencing hemorrhaging as a complication of the pregnancy.

25. Because of the hemorrhaging, Ms. Webster's physician, A.G. Chaudry, M.D., initially determined that she could not work between March 25, 2016 and April 15, 2016.

26. QI reluctantly accepted Dr. Chaudry's determination, and extended Ms. Webster's pregnancy leave by two weeks.

27. Ms. Webster's hemorrhaging continued regularly between March 25, 2016 and April 15, 2016.

28. Accordingly, on April 14, 2016 Dr. Chaudry wrote a note placing Ms. Webster on work restriction until May 2, 2016.

29. Ms. Webster provided this note to Ms. Sherman of human resources.

30. Subsequently, Ms. Webster continued to experience hemorrhaging which prohibited her from returning to work by May 2, 2016 and QI provided Ms. Webster with additional leave to May 9, 2016.

31. During this time period the hemorrhaging was consistently reoccurring.

32. The hemorrhaging caused Ms. Webster to have headaches, to feel weak, to experience blood clotting, to be fatigued, and to have problems standing. She was required by her physician to keep her feet elevated during this time.

33. When May 9, 2016 arrived, Ms. Webster was still not able to return to work due to the hemorrhaging and its attendant symptoms.

34. Accordingly, on May 9, 2016 Dr. Chaudry wrote another note stating that "the patient above is under the care of Dr. Chaudry due to postpartum complications until further notice," which Ms. Webster provided to Ms. Sherman.

35. Nonetheless, fearful that she would be terminated from her job, Ms. Webster began preparing to return to work.

36. Among her preparations was passing the range firing test on May 9, 2016, so that she was qualified for assignments.

37. On or about May 13, 2016 Ms. Webster underwent an outpatient surgical procedure for the hemorrhaging called DNC, which involved a scraping of the uterus.

38. Ms. Webster, on May 16, 2016 received from her physician a release to return to work. Ms. Webster promptly called Ms. Sherman, Major Williams (her second-line supervisor), and Captain Badoh (her first-line supervisor) to inform them that she had been released to work.

39. The first phone call which Ms. Webster placed was to Ms. Sherman, however, Ms. Webster was unable to reach her and Ms. Sherman was not returning her phone calls.

40. Ms. Webster then called her first-line supervisor and specifically let Captain Badoh know that she was ready to return to work and she had a release from her

doctor. Captain Badoh told her to get in touch with her second-line supervisor Major Williams.

41. Accordingly, Ms. Webster contacted Major Williams via phone and told Major Williams that she was ready to return to work and had a release from her doctor. Major Williams told Ms. Webster to contact Ms. Sherman. At that point, Ms. Webster let Major Williams know that she had attempted multiple times to contact Ms. Sherman, but she was not returning any of her calls or emails.

42. Additionally, on May 16, 2016, Ms. Webster told Major Williams that she had been informed by coworkers that her schedule had been posted on the Board for bid. The schedule being up for bid meant that any shifts which had formerly belonged to Ms. Webster, and which remained available to her when she returned from leave, were being permanently given away, so she had no shifts which she could work. Only then, after Ms. Webster raised the issue of the posting of the shifts, did Major Williams tell Ms. Webster that she was terminated from the Department of Transportation Contract and to contact Ms. Sherman.

43. Thus, Ms. Webster was informed of her termination on May 16, 2016, the first day upon which she was cleared by her doctor to return to work.

44. As of, May 16, 2016, Ms. Webster was actively trying to return to work, and she had contacted the Director of Human Resources, her first line supervisor, and her second line supervisor seeking to be placed on the schedule.

45. Also on May 16, 2016, QI purported to send a letter to Ms. Webster stating that "You have failed to return to work from your leave of absence which was extended twice." The letter went on to say "Quality Investigations, Inc. cannot extend you more time." Ms. Webster did not receive this letter until at least

approximately May 23rd, which casts doubt upon the allegation that it was mailed on May 16, 2016.

46. On May 17, 2016, Ms. Webster, who had not yet received the termination letter, emailed Ms. Sherman and wrote "my procedure was completed and I have been released for work. I have been communicating with the supervisors. What is my status?"

47. To this, Ms. Sherman curtly replied "We have already separated you from the company. You were due to return last week and you didn't."

48. Ms. Webster then responded again via email stating "Mrs. Sherman, I informed you that I was under doctors [sic] care because of complications and had to have a surgical procedure. My supervisors were also informed." The procedure was the outpatient DNC surgery relating to complications from pregnancy concerning the hemorrhaging.

49. Ms. Sherman then wrote back, stating "And I had informed you that we could not give any additional leave time. Your supervisors were also instructed to have you speak with only me. You have yet to show a release and a fit for duty which was required."

50. Despite the May 16, 2016 termination letter and the May 17, 2016 email correspondence from Ms. Sherman concerning termination; on May 18, 2016 Ms. Webster received an email from Ms. Sherman stating, "You need to contact Ms. Williams [Ms. Webster's supervisor] and return to work as soon as possible, but no later than Friday May 20, 2016. If you do not return to work, you will be voluntarily terminated as has been discussed with you before. There are no more extensions."

51. The May 18, 2016 email understandably created complete confusion for Ms. Webster, and she wrote to Ms. Sherman on May 19, 2016, at 5:35 AM stating "I am confused. On May 17 you told me I was already separated from the company. Am I in fact an employee or have I been fired? If I have been fired, I am confused about the language about a voluntary resignation. Can you please provide me with a clear and detailed explanation as to what my employment status is. Thank you."

52. Ms. Sherman's unsympathetic response at 8:37 AM was as follows: "I asked you to send me the doctor's note which was finally received yesterday. We have tried to work with you and I let you know yesterday that we finally received it. You asked for an exception and this was the final one we will make. As stated yesterday, if you are coming back to work, it must be by tomorrow. This will no longer be allowed to drag out. When a person does not return from a leave of absence it is considered a voluntary resignation which is a termination."

53. In response to Ms. Sherman's email, Ms. Webster almost immediately called her supervisor to attempt to get back onto the schedule.

54. Before Ms. Webster could actually get herself placed back on the schedule, at 9:53 AM, less than two hours after telling Ms. Webster that she had until the next day to report back to work, Ms. Sherman wrote that "Your doctor's note said that you were able to return as of 5/16/16. You have not returned and now want more/additional flexibility. We cannot accommodate this. Your failure to return to work is a voluntary termination. The site will no longer accept your calls."

55. QI, which refused to allow Ms. Webster even three months of leave as an accommodation, has routinely allowed non-pregnant employees with injuries to

take significantly more than three months of leave. For example, when Sharnita Bundy, another Physical Security Officer, fractured her foot exercising in November of 2015, she was allowed to be on leave until March 22, 2016.

56. Another example of how a non-pregnant employee was afforded generous leave which was not provided to Ms. Webster concerning her pregnancy related medical complications/disability, was when Kera Carter, also a Physical Security Officer, was diagnosed with Fibromyalgia in 2015. Ms. Carter was granted leave from February of 2015 to August of 2016, approximately six months. This was in contrast to the less than three months of leave which Ms. Webster was permitted to take before she was terminated for not reporting back to work—even though she repeatedly attempted to report back to work.

57. Yet another example of how a non-pregnant employee was granted liberal use of leave, which was denied to Ms. Webster, can be seen in the circumstances of Vonka Stephens-Banks. Ms. Stephens-Banks, another Physical Security Officer, was involved in a car accident in May of 2015 and was allowed to remain on leave until October of 2015 based upon the injuries she sustained. This constitutes over five months of leave, while Ms. Webster was terminated before she had even been on leave for three months.

## COUNT I
## REHABILITATION ACT DISABILITY DISCRIMINATION

58. Ms. Webster reiterates, realleges, and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

59. Ms. Webster suffered from disabling complications as a result of her pregnancy.

60. Ms. Webster was perceived as being disabled due to the complications which occurred as a result of her pregnancy.

61. Ms. Webster had a record of being disabled as a result of the physician's notes supplied by her doctor.

62. Ms. Webster was maliciously discharged on the basis of her disability, QI's perception that she was disabled, and the record of her disability.

63. Ms. Webster, prior to her absence as a result of her pregnancy and resulting complications was fulfilling QI's legitimate expectations as an employee.

64. Ms. Webster could perform her duties with an accommodation, namely leave.

65. Ms. Webster was prepared to return to work on May 16, 2016 and was able to perform her job duties at that time without any accommodation. However, she was terminated on that date due to the perception of her disability/record of her disability.

**WHEREFORE,** Ms. Webster respectfully requests that the Court grant the following relief against QI:

A. An injunction enjoining QI from employment practices that discriminate on the basis of disability.

B. An Order:

    a. Declaring QI liable to Ms. Webster for disability discrimination due to her discriminatory discharge;

    b. Directing QI to take such measures as are necessary to ensure that unlawful employment practices like those described herein are eliminated and do not recur.

C.  An award of compensatory damages, including damages for her mental anguish and humiliation in an amount to be determined at trial.

D.  An award for punitive damages in an amount to be determined at trial.

E.  An award for lost wages (including front and back pay) in an amount to be determined at trial;

F.  An award of reasonable attorneys' fees and costs;

G.  An award for expert witness fees; and

H.  An award for such other relief as this Court deems necessary and proper.

## COUNT II
## DCHRA DISABILITY DISCRIMINATION

66. Ms. Webster reiterates, realleges, and incorporates herein by reference each and every allegation contained in the preceding paragraphs.

67.  Ms. Webster suffered from disabling complications as a result of her pregnancy.

68. Ms. Webster was perceived as being disabled due to the complications which occurred as a result of her pregnancy.

69. Ms. Webster had a record of being disabled as a result of the physician's notes supplied by her doctor.

70. Ms. Webster was maliciously discharged on the basis of her disability, QI's perception that she was disabled, and the record of her disability.

71. Ms. Webster, prior to her absence as a result of her pregnancy and resulting complications was fulfilling QI's legitimate expectations as an employee.

72. Ms. Webster could perform her duties with an accommodation, namely leave.

73. Ms. Webster was prepared to return to work on May 16, 2016 and was able to perform her job duties at that time without any accommodation. However, she was terminated on that date due to the perception of her disability/record of her disability.

    **WHEREFORE,** Ms. Webster respectfully requests that the Court grant the following relief against QI:

    A.  An injunction enjoining QI from employment practices that discriminate on the basis of disability.

    B.  An Order:

        a.  Declaring QI liable to Ms. Webster for disability discrimination due to her discriminatory discharge;

        b.  Directing QI to take such measures as are necessary to ensure that unlawful employment practices like those described herein are eliminated and do not recur.

    C.  An award of compensatory damages, including damages for her mental anguish and humiliation in an amount to be determined at trial.

    D.  An award for punitive damages in an amount to be determined at trial.

    E.  An award for lost wages (including front and back pay) in an amount to be determined at trial;

    F.  An award of reasonable attorneys' fees and costs;

    G.  An award for expert witness fees; and

    H.  An award for such other relief as this Court deems necessary and proper.

## COUNT III
## DCRHA SEX DISCRIMINATION ON THE BASIS OF PREGNANCY AND CHILDBIRTH AND RELATED MEDICAL CONDITIONS

74. Ms. Webster is a female who became pregnant during the summer of 2015 and informed her employer of her pregnancy in October of 2015.

75. Prior to Ms. Webster informing QI that she was pregnant, she had never been disciplined or written-up in any way.

76. At all times Ms. Webster was meeting the legitimate expectations of her employer and was qualified for the position she held.

77. On February 25, 2016, Ms. Webster, who was at that time approximately two months from her due date of April 10, 2016, went into labor.

78. Accordingly, Ms. Webster gave birth two months prematurely to a baby boy.

79. Ms. Webster was due to return from maternity leave on March 25, 2016, but she began experiencing hemorrhaging as a complication of the pregnancy.

80. Accordingly, Ms. Webster was unable to return to work until May 16, 2016.

81. Ms. Webster had doctor's notes supporting her inability to work due to the hemorrhaging and she transmitted these notes to QI human resources.

82. On May 16, 2016 Ms. Webster was released to return to work, prepared to return to work, and she made attempts to return to work by contacting QI human resources and her first and second line supervisors.

83. Nonetheless, on that very day, May 16, 2016, Ms. Webster was terminated because of her previous absence from work—an absence necessitated by her childbirth and related medical conditions.

84. Ms. Webster had been on leave for her pregnancy and related medical conditions for less than three months.

85. Ms. Webster is aware of at least three individuals with disabilities/injuries which were not pregnancy related who were allowed to take significantly more leave than Ms. Webster.

86. Accordingly, Ms. Webster was treated in a disparate manner when compared with coworkers who suffered non-pregnancy related disabilities/injuries.

87. Moreover, Ms. Webster was discriminated against when QI, with actual malice, terminated her on May 16, 2016 although she was ready, willing, and able to return to work, for no reason other than her previous condition as a pregnant woman and her complications from childbirth which had necessitated a brief period of leave.

**WHEREFORE,** Ms. Webster respectfully requests that the Court grant the following relief against QI:

A. An injunction enjoining QI from employment practices that discriminate on the basis of pregnancy, childbirth, and related medical conditions.

B. An Order:

   a. Declaring QI liable to Ms. Webster for pregnancy discrimination due to her discriminatory discharge; and

   b. Directing QI to take such measures as are necessary to ensure that unlawful employment practices like those described herein are eliminated and do not recur.

C.  An award for compensatory damages, including damages for her mental anguish and humiliation in an amount to be determined at trial;

D.  An award for punitive damages in an amount to be determined at trial;

E.  An award for lost wages (including front and back pay) in an amount to be determined at trial;

F.  An award for reasonable attorneys' fees and costs;

G.  An award for expert witness fees; and

H.  An award for such other relief as this Court deems necessary and proper.

### JURY DEMAND

Plaintiff Erica Webster demands a jury for all issues proper to be so tried.

Respectfully submitted,

_____/s/_____
Robert J. Baror, Esq. (Bar No. 987525)
THE BAROR LAW FIRM, LLC
7315 Wisconsin Avenue, Suite 400
Bethesda, Maryland 20814
P: 301-564-0456
F: 914-273-5058
E: Robert@barorlaw.com

*Counsel for Plaintiff, Erica L. Webster*